UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:15-cr-00028-TLS-SLC |
| | ) | |
| TYRONE M. WRIGHT | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress (DE 22) filed by Defendant Tyrone M. Wright. Wright seeks to suppress statements made during an interview with police subsequent to his arrest on March 25, 2015. Wright contends that he was incapable of making a voluntary waiver of his *Miranda* rights due to his drug and alcohol use over the days preceding his arrest. Wright further contends that his statements to officers were involuntary due to his impairment and thus were in violation of his rights under the Fifth and Fourteenth Amendments.

## I. PROCEDURAL BACKGROUND

On May 27, 2015, Wright was indicted for a violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e), being a felon in possession of a firearm. (DE 1). On June 1, 2015, Wright pleaded not guilty to the charge in the single-count indictment. (DE 12).[1] On October 21, 2015, Wright filed the present motion to suppress (DE 22), and the government filed a response in opposition to Wright's motion (DE 35) on November 30, 2015. This matter was referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (DE 44, DE 50). An evidentiary hearing on this matter was held on June 8, 2016. (DE 67). On August 8, 2016, Wright filed a post-hearing brief in support of his motion to

---

[1]After the instant motion to suppress was filed, a superseding indictment was filed by the government against Wright on October 28, 2015. (DE 26). Wright entered a plea of not guilty to the charges in the superseding indictment on November 9, 2015. (DE 33).

suppress. (DE 75). The government filed its response on September 7, 2016. (DE 78). Wright failed to file a reply brief, and the time to do so has now run. After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Wright's motion to suppress be DENIED.

## II. FINDINGS OF FACT

At the evidentiary hearing, the government offered the testimony of Detective Joshua Hartup of the Fort Wayne Police Department. Wright himself testified on behalf of the defense.

### A. Detective Hartup's Testimony

Hartup testified as follows: On March 25, 2015, Wright was arrested by the Fort Wayne Police Department. (DE 74, Transcript ("Tr.") 6). Wright was taken into custody after his arrest, and he was taken to be interviewed in the interview room on the second floor of the police operations center located at 1 East Main Street, Fort Wayne, Indiana. (Tr. 6-7). The interview room is equipped to record interviews, and Wright's interview was recorded with audio and video. (Tr. 7). The recording of the interview was admitted into evidence as Government's Exhibit No. 2.

While the video is approximately two hours and 40 minutes long, Wright's actual interview was less than two hours, because Wright sat alone in the interview room for about 40 minutes before Hartup came in to begin the interview. (Tr. 13). Hartup was wearing a mask when he began the interview, in order to conceal his identity. (Tr. 13-14). Wright did not comment on the mask during the interview. (Tr. 14). When Hartup first came into the room, Wright was pounding on the wall and stated that he needed to use the restroom, but he agreed to talk first and wait to use the restroom. (Tr. 19). Hartup then took down booking information

2

from Wright, such as correct name and social security number. (Tr. 14-15). Wright was able to recall the answers to these questions and answer with ease. (Tr. 15).

Hartup then proceeded to provide Wright with his *Miranda* rights. (Tr. 8). Hartup asked Wright if he could read, write, and understand the English language, and he noted Wright's affirmative answers on the written *Miranda* warnings form, which was submitted into evidence as Government's Exhibit No. 1. (Tr. 9-10). Hartup also asked Wright what the highest grade level he had achieved in school was, and Wright advised that he had obtained a bachelor's degree in computer science from Oakland City University while he was in prison. (Tr. 10). Hartup also noted this education information on the written *Miranda* form. (Tr. 10). Hartup then turned the *Miranda* form toward Wright so that he could read along while Hartup read aloud. (Tr. 10). Hartup read Wright's *Miranda* rights to him from the first part of the form, the "advice of rights" section, and then gave Wright an opportunity to ask questions. (Tr. 10-11). Wright did not have any questions, and he signed the first part of the form stating that he understood his rights. (Tr. 10-11). Then Hartup read the second part of the form, the "waiver of rights," to Wright, before again giving him an opportunity to ask questions. (Tr. 11). Wright did not have any questions, and he signed the second part of the form indicating that he wished to continue with the interview. (Tr. 11).

Hartup then questioned Wright for approximately 40 minutes. (Tr. 13). At the end of the 40 minutes, Wright reminded Hartup that he needed to use the restroom. (Tr. 19-20). After Hartup left the room, Detective Rivera came in a few minutes later to interview Wright. (Tr. 13). After Rivera finished his part of the interview, Wright sat alone in the room for approximately 20 minutes. (Tr. 13). Hartup then returned to the room to advise Wright that he was going to be

sent to jail that day. (Tr. 13). Hartup was not wearing the mask when he came back to the room the second time. (Tr. 14).

Hartup, based upon his experience working in narcotics for 12 years, described the behavior of individuals who were under the influence of drugs or alcohol. Hartup explained that people under the influence of alcohol would "tend to be sluggish, tend to slur their words, [and] have uncontrolled movements." (Tr. 20). Hartup also stated that people under the influence of alcohol tend to be sleepy and to be shutting their eyes. (Tr. 21). Individuals under the influence of heroin "tend to be twitchy, have a hard time focusing when they tell or have conversations with us, interview, they're back and forth, they're not sure what they just spoke of, they'll repeat themselves," and their "eyes tend to be very much open, looking back and forth." (Tr. 20-21). For individuals under the influence of cocaine, "they tend to be kind of, oh, I don't want to say amped up, but it's a stimulant. And that's not a drug that stays in the system for very long. But cocaine is not one that I've seen that affects kind of the thought process. It's just definitely something that gets somebody – gets somebody going." (Tr. 21). Regarding individuals under the influence of methamphetamine, "[m]eth is one that you can't calm that person down. They're very twitchy, they're constantly moving things, constantly moving their feet, their fingers. If there's anything on the table, they're constantly moving that." (Tr. 21). People using methamphetamine also have eyes that "tend to be very much open, looking back and forth." (Tr. 21).

Hartup testified that Wright did not appear to be under the influence of any type of drugs or alcohol during the interview. (Tr. 15). Wright was not twitchy, excited, slurring his speech, or demonstrating any of the other types of behaviors caused by controlled substances. (Tr. 25).

4

Hartup explained that he carefully pays attention to interviewees, in order to make sure that no medical issues or deaths occur, and in order to make sure that the conversation is honest and truthful. (Tr. 25). Hartup stated that there was nothing to indicate that Wright was impaired; although Wright slumped over and took a nap towards the end of the interview period while the officers were out of the room, Wright was back to full conversation and did not seem sleepy "within seconds" after the officers came back in to the interview room. (Tr. 25).

Hartup stated that Wright answered all of his questions appropriately, and that he knew that many of Wright's answers were truthful based upon the surveillance the officers had conducted. (Tr. 15). Hartup noted that Wright interrupted him at times during the interview in order to correct misunderstandings in the conversation, and Wright referenced several times back to the beginning of the conversation in order to go over some of the things they had talked about earlier. (Tr. 15-16). Hartup found Wright to be articulate, very respectful, honest, truthful, and thoughtful during the interview. (Tr. 16). At times, Wright asked Hartup questions during the interview, and Wright provided information regarding other individuals' drug activity. (Tr. 16-17). Hartup stated that Wright was providing information so that the officers would take his cooperation into consideration. (Tr. 17). During the interview, Wright discussed the gun that was recovered by officers at a residence. (Tr. 17-18). Wright informed Hartup how he acquired the gun, who he acquired the gun from, the location of the gun underneath the bed at the residence, and the length of time that he had the gun. (Tr. 18). Wright also told Hartup that he was a convicted felon, that he had been using controlled substances for a long time, that he had been selling cocaine for the seven or eight months prior to the interview, and that he had recently begun selling heroin. (Tr. 19).

Hartup did not observe anything about Wright's mental state that impaired Wright's ability to answer the questions that were asked of him or impaired his ability to proceed with the interview. (Tr. 53). Wright did not black out at any point in time, and Wright did not clench his jaw during the interview. (Tr. 53-54). Hartup was only two feet or less away from Wright during the interview. (Tr. 53-54).

### B. Wright's Testimony

Wright testified as follows: He was 40 years old at the time of the hearing. (Tr. 27). He has a ninth grade education, as he dropped out of school when he was 16 years old. (Tr. 27). Wright had to repeat classes when he was in school because he had failed classes. (Tr. 28). Wright earned his bachelor's degree in 2010 while he was in prison, via a correspondence course with the help of dorm tutors. (Tr. 28-29). Wright can read, write, and understand the English language. (Tr. 29).

On March 25, 2015, Wright was at the drive-thru of a Burger King on Pettit when he was arrested. (Tr. 29-30). He was riding in the car of a friend of his, Porshe Black, and they had just picked her son up from the school bus stop. (Tr. 31-32). The officers took Wright out of the car at the Burger King, and put him into a police car. (Tr. 32-33). Wright asked the officers, "what's this about?" (Tr. 33). The officers informed Wright that he "had a body attachment." (Tr. 33). Wright's person was searched, and then the officers took him to the police station and put him into an interview room. (Tr. 33). Wright had cocaine on him when he was searched. (Tr. 33).

At the time he was arrested (he believes it was a Tuesday or Wednesday), Wright had been using Ecstasy, Molly, and cocaine since that Saturday, and he had also "smoked a little weed." (Tr. 33-34). Wright's aunt had died that previous Thursday. (Tr. 34). He had been

6

"popping pills," specifically Ecstasy and Molly, and drinking since Saturday. (Tr. 35). Wright described the different amounts of drugs that he and his friends had used, but he was not able to state the amount of drugs that he had used himself, although he stated that he "go[es] hard" and "push[es] it to the max" when he uses drugs. (Tr. 35-36).

At the time of the interview, Wright's mental state involved him thinking that he did not want to go to jail and questioning "is this real?" (Tr. 37). Wright felt like his aunt had died and his world was collapsing. (Tr. 37). Wright stated that he was "not really" "thinking right," and he "vaguely" remembered Hartup going over his rights with him in the interview room. (Tr. 37). Wright remembers Hartup reading to him, and then Wright "was like yeah, yeah, yeah, or whatever." (Tr. 37). Wright then asked Hartup what he could do to "get this away." (Tr. 37). Hartup answered Wright that "it depends on what you tell me." (Tr. 37). Wright remembers Hartup saying "some stuff like okay, you got to be truthful . . . ." (Tr. 38). Wright signed the form because he felt like the outcome of his arrest, whether he would be able to go home to his family, depended on what he told Hartup. (Tr. 38). Wright did not know what his mental state was like when he was arrested and taken to be interviewed; all he knew was that he wanted to go home. (Tr. 40). Wright "blocked [] out" Hartup's reading of his rights because he was focused on telling the officer information so that he could get out of there. (Tr. 40).

Wright has been using drugs since 1993 when he was 15 or 16 years old. (Tr. 38). Over the years, Wright has used alcohol, marijuana, Molly, cocaine, and Ecstasy, and he tried acid. (Tr. 39). While he started using drugs in 1993, he was "back and forth" and "slowed down" while being incarcerated and on probation, but then he relapsed. (Tr. 45). Wright's tolerance was lower after he had been clean for awhile. (Tr. 48-49). Wright stated that he does "not

7

really" have the sorts of physical manifestations typical of individuals under the influence of cocaine or Ecstasy, because the physical manifestations "differ from person to person." (Tr. 39-40). Wright explained that cocaine gives him energy and also makes his nose run; it makes him sniff like someone who has a cold. (Tr. 42). Marijuana, on its own, makes Wright "lay back" and makes his eyes "tight" or "slanted." (Tr. 42). When he does marijuana and another drug together, his eyes "bug" and get red. (Tr. 42). Ecstasy makes Wright bite his lip or clench his jaws, and it makes him "tense up." (Tr. 42). Wright stated that sometimes he blacks out from using drugs and then does not remember it. (Tr. 50-51).

Wright admitted during cross examination that he had a felony battery and burglary conviction in 2007; a felony conviction for resisting law enforcement in 2005; a felony conviction in 2001 for dealing in cocaine or narcotic drugs; and a 1994 conviction for dealing cocaine and conspiring to deal cocaine. (Tr. 41, 44-45). Wright agreed that his interview with Hartup was captured in the recording submitted as Government's Exhibit No. 2. (Tr. 41). Wright also agreed that his signature was on both portions of the *Miranda* form submitted as Government's Exhibit 1. (Tr. 46-47). Wright stated that he had heard his *Miranda* rights before, when he had gone to jail after a domestic violence incident. (Tr. 51-52).

In the four or five days prior to his arrest, Wright stated that he was just taking "catnaps" because he was dealing with a funeral and family matters. (Tr. 49). Wright slept only "2 hours at the most." (Tr. 49-50).

### C. Findings

Wright's testimony conflicted minimally with Hartup's testimony, as Wright testified that he was under the influence of drugs and alcohol at the time of the interview but nevertheless

8

did not show any physical manifestations of being under the influence. Hartup's testimony that Wright was not under the influence during the interview, however, was more credible and was supported by the recording of the interview submitted as Government's Exhibit No. 2. Wright explained the ways that different drugs affect him, and he described the physical manifestations that he experiences when using the different drugs. (Tr. 42, 50-51). Cocaine gives him energy and makes his nose run, marijuana on its own makes his eyes "tight" or "slanted," marijuana in combination with other drugs makes his eyes "bug" and get red, Ecstasy makes him clench his jaw and tense up (Tr. 42), and drugs have made Wright black out before without him remembering it (Tr. 50-51). Hartup testified credibly that Wright did not exhibit any of these behaviors or physical manifestations during the interview. (Tr. 53-54).

While Wright may have indeed used a variety of drugs and consumed alcohol in the days prior to the interview, at the time that Hartup began interviewing Wright, he was not under the influence of drugs or alcohol such that he did not understand what was going on or was incapable of making decisions about how to proceed. Wright remembered Hartup going over the rights form, and he chose to just say "yeah, yeah, yeah" to get it over with so that he could try to provide information to the officers because he hoped they would let him go, since he felt that his family needed him. Wright's strategic decision and memory of the interview indicates that he was not so impaired that he could not make a voluntary, knowing, and intelligent waiver of his rights. While Wright claimed at one point during his testimony that he only "vaguely" remembered the interview, at other parts of his testimony he recalled specifically what he said to Hartup during the interview, and thus Wright's testimony appears to be largely self-serving.

Accordingly, I FIND that Hartup properly informed Wright of his *Miranda* rights at the

9

beginning of the interview, that Wright waived those rights, and that Wright was not so impaired that he could not make a voluntary, knowing, and intelligent waiver. I further FIND Hartup's testimony to be entirely credible, as it was not meaningfully contested by Wright at the hearing or in Wright's post-hearing briefing, and because it was supported by the recording of the interview submitted as Government's Exhibit No. 2. I also FIND that Wright's testimony is credible to the extent that it does not conflict with Hartup's testimony and the video evidence.

### III. APPLICABLE LAW

There are two legal issues here. The first is whether Wright's waiver of his *Miranda* rights was made voluntarily, knowingly, and intelligently. The second is whether Wright's statements to Hartup were involuntary such that they violate the Fifth Amendment's privilege against self-incrimination and the Due Process Clause of the Fourteenth Amendment.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "held that the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). A waiver of a suspect's *Miranda* rights is valid only if it is made voluntarily, knowingly, and intelligently. *United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A two-step inquiry is required to determine whether a waiver meets this standard. *Id.*

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the

10

> decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.*  The government has the burden of showing waiver was valid by a preponderance of the evidence.  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

When reviewing the totality of the circumstances to determine whether a defendant's waiver of *Miranda* rights was voluntarily, knowingly, and intelligently made, courts consider the following factors: "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical."  *Vallar*, 635 F.3d at 284 (quoting *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009)).  Impairments caused by the use of drugs and alcohol are appropriate factors for the court to consider when evaluating a *Miranda* waiver.  *See United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997).  However, "a defendant's intoxication . . . by itself—without some showing of coercion by the government—will not negate voluntariness."  *United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992); *see also United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004).  "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective."  *Chrismon*, 965 F.2d at 1469 (citing *Andersen v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990)).

As to voluntariness under the Fifth and Fourteenth Amendments, "[a] trial court may admit a confession into evidence only if the accused made it voluntarily."  *United States v.*

*Dillon*, 150 F.3d 754, 757 (7th Cir. 1998) (citing *Colorado v. Connelly*, 479 U.S. 157, 166 (1986); *United States v. Williams*, 128 F.3d 1128, 1131 (7th Cir. 1997)); *see also United States ex rel. Hudson v. Cannon*, 529 F.2d 890, 893 (7th Cir. 1976) (noting that both the Fifth and Fourteenth Amendments require exclusion of involuntary statements extracted by police coercion). "The test for a voluntary confession is whether the defendant's will was overborne at the time he confessed." *United States v. Haddon*, 927 F.2d 942, 945-46 (7th Cir. 1991) (quoting *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir. 1988)) (internal quotation marks omitted). Coercive police activity must be causally related to a confession for it to be involuntary within the meaning of the Fourteenth Amendment. *Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

## IV. ANALYSIS

Wright advances two arguments. First, he argues that because of his cocaine usage, he did not have the capacity to understand and appreciate the meaning of the *Miranda* rights read to him by Hartup; and thus he contends that his incriminating statements should be suppressed because his waiver was not voluntary. Second, Wright appears to be arguing that his statements to the officers should be suppressed because they were not voluntarily made for purposes of the Fifth and Fourteenth Amendments.

### A. Voluntariness of Wright's *Miranda* Waiver

There is no question here that Wright was in custody and subject to interrogation, and thus the *Miranda* requirement was triggered, as Wright had been arrested and taken to an

12

interview room where officers were asking him questions.  *See United States v. Jones*, 600 F.3d 847, 854 (7th Cir. 2010) (noting that "a defendant must both be in custody and subject to 'interrogation' to trigger the *Miranda* requirement" (citing *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994))).  Thus the Court must determine whether the *Miranda* requirements were satisfied, that is, whether Wright's waiver was made voluntarily, knowingly, and intelligently. *Vallar*, 635 F.3d at 284.

As noted above, a waiver is voluntary where it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*  A waiver is made knowingly and intelligently where it has "been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  Here, Wright does not argue that the officers took any improper coercive action in order to intimidate or deceive him into waiving his rights.  Instead, Wright argues that "his extensive use of drugs leading up to his arrest and interview resulted in an intoxication level such that he was highly susceptible to interrogation techniques."  (DE 75 at 5).  Wright further argues:

> He did not understand the rights that were read to him from the Miranda form, which resulted in an inability on his part to make a voluntary waiver of those rights.  He was not able to consider whether or not he should remain silent or whether he should talk to an attorney.  The only thing that consumed his mind was the need to leave the police station, use more drugs, and be with his family.

(DE 75 at 5).

Wright's arguments are unpersuasive.  While impairments caused by the use of drugs and alcohol are appropriate factors for the court to consider when evaluating a *Miranda* waiver, *Brooks*, 125 F.3d at 492, "a defendant's intoxication . . . by itself—without some showing of

13

coercion by the government—will not negate voluntariness," *Chrismon*, 965 F.2d at 1469. I found above that Wright was not so impaired at the time of his interview by his use of drugs and alcohol over the days preceding his arrest that he could not make a voluntary, knowing, and intelligent waiver of his rights. However, even assuming *aguendo* that Wright was intoxicated to the extent he claims at the time of the interview, the case law is clear that his intoxication will not negate voluntariness unless there is also a showing of coercion by the government. There is no such showing here, and thus Wright's *Miranda* waiver was voluntary. That Wright's waiver was voluntarily, knowingly, and intelligently made is supported by Officer Hartup's testimony and the video recording of the interview, as well as Wright's age, education, and prior experience with the criminal justice system.

### B. Voluntariness of Wright's Statements

Wright's second argument is that his statements were made involuntarily because he "obviously[] wasn't thinking right and his statements were the product of his inability to understand his rights." (DE 75 at 5-6). Wright thus contends that his confession was involuntary and should be excluded under the Fifth Amendment's privilege against self-incrimination and the Due Process Clause of the Fourteenth Amendment.

As discussed above, both the Fifth and Fourteenth Amendments require exclusion of involuntary statements extracted by police coercion. *Cannon*, 529 F.2d at 893. And while "[t]he test for a voluntary confession is whether the defendant's will was overborne at the time he confessed," *Haddon*, 927 F.2d at 945-46, there must also be "police conduct causally related to the confession, [or else] there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law," *Connelly*, 479 U.S. at 164. Wright does not argue that

the police took any coercive action in order to get him to confess. Rather, he argues that "his extensive use of drugs leading up to his arrest and interview resulted in an intoxication level such that he was highly susceptible to interrogation techniques." (DE 75 at 5). I found above that Wright was not so impaired at the time of the interview that his participation in the interview was involuntary. Even assuming *arguendo* that Wright was impaired to such an extent, that level of impairment, on its own, would not meet the requirements necessary for his statements to be found involuntary under the Fifth and Fourteenth Amendments, as Wright has not shown that officers took any coercive action to procure his confession. Hartup's testimony and the video recording of the interview demonstrate that Wright's statements were voluntarily made, in an apparent effort for Wright to obtain lenience from the officers. There is no evidence before the Court showing that the officers took any coercive action to force Wright to make the statements; rather, the evidence shows that Wright made the statements because he believed that cooperating with the officers was in his best interest.

## V. CONCLUSION

For the above reasons, I CONCLUDE that Wright's waiver of his *Miranda* rights was voluntarily, knowingly, and intelligently made, and I further CONCLUDE that Wright's statements to the officers were voluntary and were not obtained in violation of his Fifth or Fourteenth Amendment rights. I therefore RECOMMEND that Wright's motion to suppress (DE 22) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the

proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Dated this 21st day of October 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge